UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

**UC SOLUTIONS, LLC**,

**GP TRADING PARTNERS, LLC**, and

**PROTECTIVE APPAREL, LLP**,

                        Plaintiffs,

vs.

**SAADIA SHAPIRO**,

**VADIM LEYBEL**,

**BORIS LEYBEL**,

**ERIC PEREMAN**,

**CAST GROUP, LLC**,

**PAZ GLOBAL VENTURES, LLC**,

**CAST CAPITAL LENDING CORP.**,

**BMV EQUITIES, LLC**,

**PROSPERITAS CAPITAL, LLC**,

**SHAPIRO & ASSOCIATES
ATTORNEYS AT LAW, PLLC**, and

**REBOUND HOLDINGS, LLC**,

                        Defendants.
_____

               **COMPLAINT**

            Civil Case No.

       Plaintiffs, UC SOLUTIONS, LLC ("UC SOLUTIONS"), GP TRADING PARTNERS, LLC ("GPTP"), and PROTECTIVE APPAREL, LLP ("PROTECTIVE APPAREL") (collectively the "Plaintiffs"), by and through their attorneys, THE TARANTINO LAW FIRM, LLP, for their Complaint against the Defendants, SAADIA SHAPIRO ("SHAPIRO"); VADIM LEYBEL ("V.

LEYBEL"); BORIS LEYBEL ("B. LEYBEL"); ERIC PEREMAN ("PEREMAN"); CAST GROUP, LLC ("CAST GROUP"); PAZ GLOBAL VENTURES, LLC ("PAZ"); CAST CAPITAL LENDING CORP. ("CAST CAPITAL"); BMV EQUITIES, LLC ("BMV"); PROSPERITAS CAPITAL, LLC ("PROSPERITAS"); SHAPIRO & ASSOCIATES ATTORNEYS AT LAW, PLLC ("SHAPIRO & ASSOCIATES"); and REBOUND HOLDINGS, LLC ("REBOUND") (collectively referred to as the "Defendants," the "Cast-Paz Enterprise," or the "Enterprise"); respectfully allege as follows:

## **INTRODUCTION**

1.      Plaintiffs bring this civil action against the Defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act[1] ("RICO"), 18 U.S.C. § 1964(c), for damages sustained to their business and property by virtue of the Defendants' engagement in interstate commerce through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), as well as Defendants' conspiracy to violate RICO, in violation of 18 U.S.C. § 1962(d).

2.      Defendant SHAPIRO holds himself out as a legitimate businessman and attorney, but the reality is that he hides behind his law license, using it as a license to defraud businesses and individuals like the Plaintiffs.  Under the façade of legitimacy reinforced by Defendant SHAPIRO's license to practice law, the Defendants, individually and through their corporate entities, operated an illegal "association-in-fact enterprise"[2] that engaged in a pattern of racketeering activity designed to defraud the Plaintiffs and others.  The Cast-Paz Enterprise includes the individual Defendants and the legal entity Defendants, which are shell companies that

---

[1] 18 U.S.C. §1961-1968, enacted as Title IX of the Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922, 923 (1970).

[2] These individual Defendants operate an "associate-in-fact enterprise" as defined in 18 U.S.C. § 1961(4), but Defendant CAST CAPITAL qualifies as an "enterprise" under 18 U.S.C. § 1961(4) independently. which includes CAST CAPITAL at its center.

are interwoven and specifically setup to perpetrate fraudulent schemes like the one orchestrated against the Plaintiffs involving PPE.

3.     As the Complaint outlines, during the Covid-19 pandemic the Enterprise, vis-à-vis Defendants SHAPIRO, V. LEYBEL, B. LEYBEL, and PEREMAN, conspired and created an "enterprise" with the common purpose of perpetrating a fraudulent PPE scheme involving nitrile gloves and other products.  The Defendants used the Cast-Paz Enterprise to defraud the Plaintiffs out of **Three Million Thirty-Five Thousand Eight Hundred Forty-Six and 00/100 ($3,035,846.00) Dollars**, which was obtained by the Cast-Paz Enterprise between December 2020 and July 2021 as part of a fraudulent PPE scheme.

4.     The fraudulent PPE scheme eventually began to unravel, and by the end of July 2021 the Plaintiffs had discovered that they were victims of an elaborate fraud.  Since that time, the Plaintiffs have learned that the Defendants are no strangers to fraud, and the Plaintiffs have uncovered that each of the Defendants, individually and through their corporate entities, have participated in an unlawful RICO enterprise by engaging in a pattern of racketeering activity that caused the Plaintiffs, and others, significant injury.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(a).

6.     This Court has personal jurisdiction over the parties, as there were monetary transactions and racketeering activity which violated 18 U.S.C. § 1962(c) and (d) that were directed at Plaintiff UC SOLUTIONS, which has a principal place of business located in Erie County, New York.  Moreover, nationwide service of process is conferred by 18 U.S.C. § 1965(b)

for violations of 18 U.S.C. § 1962, as long as the Court has personal jurisdiction over at least one (1) party.

## PARTIES

### *Plaintiffs*

7.      Plaintiff UC SOLUTIONS is a Virginia limited liability company with a principal place of business located at 651 Delaware Avenue, Buffalo, New York 14202.  UC SOLUTIONS is a person under 18 U.S.C. § 1961(3).[3]  Plaintiff UC SOLUTIONS was a member of Plaintiff GPTP, and it provided capital directly to the Enterprise on behalf of Plaintiffs during the relevant periods of time.

8.      Plaintiff GPTP is a Delaware limited liability company with a principal place of business in Los Angeles, California.  Plaintiff GPTP distributes PPE, including nitrile gloves, to clients throughout the United States.  GPTP is a person under 18 U.S.C. § 1961(3).

9.      Plaintiff PROTECTIVE APPAREL is a Delaware limited liability company with a principal place of business in Los Angeles, California.  Plaintiff PROTECTIVE APPAREL is the predecessor-in-interest to Plaintiff GPTP.  Plaintiff PROTECTIVE APPAREL is a person under 18 U.S.C. § 1961(3).

### *Individual RICO Defendants*

10.     Defendant SHAPIRO is an individual who resides at 325 Maple Street, Englewood, New Jersey 07631.  Upon information and belief, Defendant SHAPIRO is an attorney at law licensed to practice in the State of New York, with an office located at 3145 Coney Island Avenue, Brooklyn, New York 11235[4].  Defendant SHAPIRO is a person under 18 U.S.C. § 1961(3).  Upon

---

[3] 18 U.S.C. § 1961(3): "'[P]erson' includes any individual or entity capable of holding a legal or beneficial interest in property…"
[4] The real property is owned by Defendant REBOUND, which is operated by Defendant SHAPIRO as part of and in furtherance of the Cast-Paz Enterprise.

information and belief, Defendant SHAPIRO is the mastermind and leader of the Cast-Paz Enterprise.

11.     Defendant V. LEYBEL is an individual who resides in the State of New Jersey. Defendant V. LEYBEL is the son of Defendant B. LEYBEL.  Defendant V.  LEYBEL is a person under 18 U.S.C. § 1961(3).

12.     Defendant B. LEYBEL is an individual who resides at 15 Cedarwood Lane, Saddle River, New Jersey 07458.  Defendant B. LEYBEL is the father of Defendant V. LEYBEL. Defendant B. LEYBEL is a person under 18 U.S.C. § 1961(3).

13.     Defendant PEREMAN is an individual who resides in the State of New Jersey. Defendant PEREMAN is a person under 18 U.S.C. § 1961(3).

### *Legal Entity RICO Defendants*

14.     Defendant CAST GROUP is a New Jersey limited liability company with a principal place of business located at 265 West 37th Street, 18th Floor, New York, New York 10018. Upon information and belief, Defendant CAST GROUP is a wholly owned subsidiary of Defendant BMV.  Defendant CAST GROUP is a person under 18 U.S.C. § 1961(3).  Unless otherwise specified, every time that Defendant CAST GROUP is alleged to have committed an action, that action was committed both in its capacity as a corporation, and at the behest and direction of Defendant V. LEYBEL and Defendant B. LEYBEL.

15.     Defendant PAZ is a New York limited liability company with a principal place of business located at 3145 Coney Island Avenue, Brooklyn, New York 11235.  Upon information and belief, Defendant PAZ is solely owned and operated by Defendant SHAPIRO.  Defendant PAZ is a person under 18 U.S.C. § 1961(3).  Unless otherwise specified, every time that Defendant

PAZ is alleged to have committed an action, that action was committed both in its capacity as a corporate entity, and at the behest and direction of Defendant SHAPIRO.

16.     Defendant CAST CAPITAL is a New York corporation with a principal place of business located at 2160 N. Central Road, Suite 303, Fort Lee, New Jersey 07024.  Upon information and belief, Defendant CAST CAPITAL is owned and operated by the Individual Defendants through their shell corporations, Defendant PROSPERITAS (SHAPIRO and PEREMAN) and Defendant BMV (V. LEYBEL and B. LEYBEL).  Defendant CAST CAPITAL is a person under 18 U.S.C. § 1961(3).  Unless otherwise specified, every time that Defendant CAST CAPITAL is alleged to have committed an action, that action was committed both in its capacity as a corporation, and at the behest and direction of Defendant SHAPIRO, Defendant V. LEYBEL, Defendant B. LEYBEL, and Defendant PEREMAN.

17.     Upon information and belief, Defendant BMV is a New Jersey limited liability company with a principal place of business located at 15 Cedarwood Lane, Saddle River, New Jersey 07458.  Upon information and belief, Defendant BMV is currently owned and operated by Defendant V. LEYBEL and Defendant B. LEYBEL.  Upon further information and belief, at the time it was formed on or about August 31, 2020, non-party, Matthew Elling, had an ownership interest in Defendant BMV.  Defendant BMV is a person under 18 U.S.C. § 1961(3).  Unless otherwise specified, every time that Defendant BMV is alleged to have committed an action, that action was committed both in its capacity as a corporate entity, and at the behest and direction of Defendant V. LEYBEL and Defendant B. LEYBEL.

18.     Upon information and belief, Defendant PROSPERITAS is a New York limited liability company with a principal place of business located at 3145 Coney Island Avenue, Brooklyn, New York 11235.  Upon information and belief, Defendant PROSPERITAS is owned

and operated by Defendant SHAPIRO and Defendant PEREMAN.  Defendant PROSPERITAS is a person under 18 U.S.C. § 1961(3).  Unless otherwise specified, every time that Defendant PROSPERITAS is alleged to have committed an action, that action was committed both in its capacity as a corporate entity, and at the behest and direction of Defendant SHAPIRO and Defendant PEREMAN.

19.     Upon information and belief, Defendant SHAPIRO & ASSOCIATES is a New York professional service limited liability company with a registered office address of 2291 Adam Clayton Powell Jr. Blvd., New York, New York 10030.  Upon information and belief, Defendant SHAPIRO & ASSOCIATES is owned and operated by Defendant SHAPIRO.  Defendant SHAPIRO & ASSOCIATES is a person under 18 U.S.C. § 1961(3).  Unless otherwise specified, every time that Defendant SHAPIRO & ASSOCIATES is alleged to have committed an action, that action was committed both in its capacity as a corporate entity, and at the behest and direction of Defendant SHAPIRO.

20.     Upon information and belief, Defendant REBOUND is a New York limited liability company with a registered address of 3145 Coney Island Avenue, Brooklyn, New York 11235.  Upon information and belief, Defendant REBOUND is owned and operated by Defendant SHAPIRO, and it is the titled owner to the real property located at 3145 Coney Island Avenue, Brooklyn, New York 11235.  This property was and is used by the Enterprise in order to further its racketeering activities, and it was used in the perpetration of the Enterprise's fraudulent PPE scheme against Plaintiffs and others.  Defendant REBOUND is a person under 18 U.S.C. § 1961(3).  Unless otherwise specified, every time that Defendant REBOUND is alleged to have committed an action, that action was committed both in its capacity as a corporate entity, and at the behest and direction of Defendant SHAPIRO.

### *Other Relevant Persons and Entities*

21.     Upon information and belief, Matthew Elling ("Elling") was a childhood friend of V. LEYBEL and a founding member and owner of Defendant BMV.  Upon further information and belief, Elling left the company shortly after its founding, following a dispute between himself and V. LEYBEL, after V. LEYBEL had admitted to Elling that he had known all along that the nitrile gloves they were ordering through Defendants CAST GROUP and PAZ for the Plaintiffs (and others) were not medical-grade gloves.  It is not believed that Elling was aware of the Cast-Paz Enterprise's fraudulent PPE scheme at the time Defendant BMV was created.

22.     Upon information and belief, Peter "Pinni" Zveduniuk ("Zveduniuk"), was the owner and CEO of Glover Court Trading PLTD ("Glover Court"), which is a foreign entity with manufacturing connections in Southeast Asia and from which Defendants CAST GROUP and PAZ ostensibly obtained the fraudulent nitrile gloves.  Upon further information and belief, Zveduniuk is now deceased.  It is unknown whether Glover Court is still operating since his death, and it is unknown whether Zveduniuk or Glover Court were directly involved in the Enterprise or just used as a means to perpetrate the Enterprise's PPE fraud.

23.     Arthur Irizarry ("Irizarry") was a salesperson and strategic account consultant for Defendant CAST GROUP, and he served as one of the primary points of contact between Plaintiffs and the Enterprise with respect to the Plaintiffs attempts to acquire legitimate, medical-grade nitrile gloves.  It is not believed that Irizarry had any ownership interest in any of the RICO Defendants, nor is it believed that he knowingly engaged in racketeering activity with the Enterprise.  Upon information and belief, after the Plaintiffs discovered the extent of the fraud committed by the Defendants and brought it to their attention, Irizarry either resigned or was otherwise terminated from his position with Defendant CAST GROUP.

24.     Upon information and belief, Sarah Lari ("Lari") was and is the officer manager and administrative assistant for Defendants CAST GROUP, CAST CAPITAL, and PAZ.  Upon information and belief, she works at the direction of Defendants V. LEYBEL, B. LEYBEL, and SHAPIRO, and she knowingly assists the Enterprise to further its fraudulent schemes, including the PPE fraud committed against the Plaintiffs.  It is unknown wither Lari has any ownership or pecuniary interest in the Cast-Paz Enterprise.

### *The Cast-Paz RICO Enterprise Flowchart*

25.     Upon information and belief, the following represents an outline of the Cast-Paz Enterprise and the roles of each person therein.  This chart is also attached as Appendix B to Plaintiff's RICO Case Statement.



CAST-PAZ RICO ENTERPRISE FLOWCHART

## STATEMENT OF FACTS

### *The Creation of the Cast-Paz Enterprise*

26.     Defendant SHAPIRO was associates with Defendant B. LEYBEL and, through that personal relationship, has known Defendant V. LEYBEL for many years.  Shortly after the outbreak of the Covid-19 pandemic, Defendant SHAPIRO saw an opportunity to perpetrate a fraudulent PPE scheme by using some of his existing corporate entities, in particular Defendants PAZ and PROSPERITAS, and some of the entities owned by Defendant V. LEYBEL, in particular Defendants CAST CAPITAL and CAST GROUP.

27.     The conspiracy turned into reality beginning in August 2020, and Defendants SHAPIRO, V. LEYBEL, PEREMAN, and B. LEYBEL began to formalize the Cast-Paz Enterprise.  First, on or about August 31, 2020, Defendant SHAPIRO, through his law firm Defendant SHAPIRO & ASSOCIATES, set up a new entity, Defendant BMV, which is owned by Defendants V. LEYBEL and B. LEYBEL.  Defendant SHAPIRO, through his law firm Defendant SHAPIRO & ASSOCIATES, thereafter modified the ownership of Defendant CAST GROUP, which resulted in Defendant BMV owning 100% of Defendant CAST GROUP.

28.     In the beginning of October 2020, a new Shareholder Agreement was drafted by Defendant SHAPIRO for Defendant CAST CAPITAL, and the ownership structure was modified to reflect 50% ownership by Defendant BMV and 50% ownership by Defendant PROSPERITAS. The resulting ownership structure of Defendant CAST CAPITAL associated the individual Defendants in fact (through their legal entities), and Defendants SHAPIRO, PEREMAN, V. LEYBEL, and B. LEYBEL each effectively own a 25% interest of Defendant CAST CAPITAL.

29.     Through the Cast-Paz Enterprise, the Defendants have engaged in a pattern of racketeering activity that has caused direct and proximate harm to numerous businesses, including the Plaintiffs.

### *Plaintiffs Introduction to the Cast-Paz Enterprise*

30.     In November 2020, Plaintiff PROTECTIVE APPAREL was introduced to a "group" out of New York who represented to Plaintiffs that they had access to and could procure blue, powder-free nitrile gloves, in a variety of sizes, and that were medical-grade and at least 4 mil. thick (the "Gloves").  The group – which in reality was the Cast-Paz Enterprise – was headed up by the Defendants, SHAPIRO and V. LEYBEL, and they advised the Plaintiffs that they had a network of entities, including Defendants CAST CAPITAL, CAST GROUP, and PAZ, that they used to procure the Gloves.

31.     In order to induce the Plaintiffs to commit to the Enterprise's fraudulent PPE scheme, the Defendants lied to Plaintiffs about their relationships with various manufacturers of PPE in China and Thailand, forged documents, actively prevented Plaintiffs from mitigating any of its losses, and engaged in other criminal and racketeering activities in order to defraud Plaintiffs. As a result, between December 8, 2020 and June 29, 2021, before Plaintiffs had uncovered the extent of fraud committed by the Enterprise, they were induced to enter into numerous written agreements with the Enterprise for the purported purchase of Gloves, and wired the Enterprise a total amount of $3,035,846.00.  Throughout this entire time, however, the members of the Enterprise knew that they never intended on procuring any Gloves for the Plaintiffs, and they knew that the nitrile gloves they were procuring from its overseas co-conspirator were non-medical grade nitrile gloves.

32.     At the beginning of their business relationship, the Enterprise provided Plaintiffs with sham sample materials and phony "references" from the alleged manufacturers in order to induce the Plaintiffs into its PPE fraud.  Unbeknownst to Plaintiffs at the time, one such reference was from Defendant PEREMAN, who had contacted the Plaintiffs via telephone and intentionally misrepresented to them who he was and what Gloves the Enterprise was able to procure.

33.     Upon information and belief, besides Defendant PEREMAN, other associates and employees of the Enterprise, including Lari, were instructed to provide fraudulent references to the Plaintiffs in order to induce them into purchasing Gloves from the Enterprise.

### *The First Agreement and Amended First Agreement*

34.     Based on these initial fraudulent representations, on or about December 8, 2020, Plaintiffs entered into the first sales and purchase agreement with the Enterprise, which was executed by Plaintiff PROTECTIVE APPAREL and Defendant CAST GROUP (the "First Agreement").  Under the First Agreement, Defendant CAST GROUP agreed to sell Plaintiffs four (4) containers, or 144,000 boxes, of the Gloves in exchange for $1,476,000.00 ($10.25 per box). The First Agreement indicated that payment would be made in two (2) installments: 30% upon execution of the First Agreement and then 70% upon issuance of the draft bill of lading.  A copy of the First Agreement is attached hereto as **Exhibit A**.

35.     The First Agreement provided that payments were to be held in escrow by Defendant SHAPIRO in the IOLA account maintained by Defendant SHAPIRO & ASSOCIATES until inspection was complete.  In this regard, at the same time the parties executed the First Agreement, they executed an Escrow & Paymaster Agreement.  A copy of the Escrow & Paymaster Agreement is attached hereto as **Exhibit B**.

36.     Upon information and belief, Defendant SHAPIRO intentionally directed that these funds be deposited into his law firm's IOLA account in an effort to commingle the funds and avoid any subsequent attachment or seizure by the Plaintiffs or other victims of the Enterprise's frauds, including its PPE fraud.  Upon further information and belief, Defendant SHAPIRO used this as an opportunity to leverage his position and status as a licensed New York State attorney, with the specific intent to ease any suspicion or hesitancy that the Plaintiffs may have had at the outset of the business relationship.

37.     Pursuant to the terms of the First Agreement, Plaintiff UC SOLUTIONS wired a total of $701,100.00[5] to Defendant SHAPIRO & ASSOCIATES, which was supposed to be held in escrow in the law firm's IOLA account until inspection was complete.  Copies of the receipts for the wires are attached hereto collectively as **Exhibit C**.

38.     Within weeks of receiving the wires from GPTP and before the purchased containers were supposed to arrive, the Enterprise approached the Plaintiffs with a proposal.  Although the Plaintiffs did not know it at the time, the Enterprise was beginning to draw the Plaintiffs into its fraudulent PPE scheme in earnest.

39.     Sometime in the beginning of January 2021, the Cast-Paz Enterprise, through Defendants SHAPIRO and V. LEYBEL, indicated to the Plaintiffs that their financing had run out and that they needed additional cash to complete the purchase of the Gloves that they had agreed to sell to Plaintiffs in the First Agreement.  This was not true, and the real purpose of the proposal was to fraudulently induce Plaintiffs to agree to release the funds being held in escrow in Defendant SHAPIRO's law firm's IOLA account, and to induce Plaintiffs into executing another contract

---

[5] A first wire in the amount of $442,800.00 was initiated by Plaintiff UC SOLUTIONS and sent to Defendant SHAPIRO & ASSOCIATES on December 9, 2020, and a second wire in the amount of $258,300.00 was initiated on December 28, 2020.

where they would be required to send additional funds to the Enterprise in order to secure delivery of the Gloves.

40.     More specifically, to assist with their alleged cash shortage, Defendants SHAPIRO and V. LEYBEL proposed to Plaintiffs that they agree to release the $701,100.00 being held in escrow by Defendant SHAPIRO & ASSOCIATES, and that the parties amend the First Agreement so that GPTP paid a larger deposit, this time directly to Defendant PAZ instead of into escrow. Wanting to ensure that it was able to complete its purchase of the Gloves, Plaintiffs agreed to the proposal and the parties executed an amendment to the First Agreement on January 11, 2021 (the "Amended First Agreement").  A copy of the Amended First Agreement is attached hereto as **Exhibit D**.

41.     Pursuant to the terms of the Amended First Agreement, Plaintiff UC SOLUTIONS caused another wire to be sent to the Enterprise on January 12, 2021, this one to Defendant PAZ and in the amount of $104,850.00.  A copy of the receipt for that wire is attached hereto as **Exhibit E**.

42.     As of January 12, 2021, Plaintiffs had wired the Enterprise a total of $805,950.00 for the purported purchase of 144,000 boxes (four (4) shipping containers) of Gloves.  These funds were accepted by the Enterprise, and the Enterprise renegotiated the First Agreement in bad faith and with actual knowledge that they would not and could not provide the Plaintiffs with medical-grade Gloves.

43.     At the time that the parties negotiated and entered into the First Agreement and the Amended First Agreement, the Defendants knew they were unable to procure the Gloves, and they had specifically procured non-medical grade nitrile gloves using the funds they had fraudulently obtained from the Plaintiffs (and others) as part of the Enterprise's fraudulent PPE scheme.  In

fact, throughout the entire relationship between the Plaintiffs and the Defendants, it was represented to the Plaintiffs that the nitrile gloves being procured by the Defendants were medical-grade. However, as evidenced by subsequently uncovered bills of lading for shipments of nitrile gloves ordered by the Enterprise on or about November 7, 2020, November 9, 2020, December 23, 2020, and February 4, 2021, the Enterprise was aware that the only nitrile gloves it was procuring were for non-medical use. These bills of lading were not provided to the Plaintiffs by the Enterprise, and were only discovered after arbitration between the parties was commenced on or about September 9, 2021. Copies of these bills of lading are attached hereto collectively as **Exhibit F**.

44.     Upon information and belief, the Enterprise knew that the non-medical grade nitrile gloves would be non-conforming and rejected by the Plaintiffs, whose customers required and were paying Plaintiffs for medical-grade nitrile Gloves. Once rejected, the Enterprise could (and did) turn around and sell the non-conforming nitrile gloves to other industries that did not have any requirements to use medical-grade gloves during Covid-19 (i.e. the restaurant or hospitality industries).

### *The Second Agreement*

45.     None of the shipping containers purportedly carrying the Gloves purchased under the First Agreement or Amended First Agreement arrived by the projected date of January 15, 2021. Due to the shipping delays throughout the United States during the Covid-19 pandemic, however, this was not unusual at the time. Around that time, the Enterprise represented to Plaintiffs, through Defendants SHAPIRO and V. LEYBEL, that four (4) shipping containers containing the Gloves would be arriving in port within a few weeks. This was another

misrepresentation, however, as the Defendants were fully aware that only two (2) of the four (4) containers were actually in transit at that time.

46.    Prior to any of the containers from the First Agreement or Amended First Agreement arriving in port, Plaintiffs were induced to enter into another sales and purchase agreement with the Enterprise.  Based on additional misrepresentations made by persons engaged in the Enterprise regarding its ability to procure medical-grade Gloves, Plaintiff GPTP entered into another agreement to purchase an additional ten (10) containers (330,000 boxes) of Gloves for $10.20 per box (a total of $3,366,00.00) (the "Second Agreement").  The Second Agreement was executed by Plaintiff GPTP and Defendant CAST GROUP on February 2, 2021.  A copy of the Second Agreement is attached hereto as **Exhibit G**.

47.    Similar to the Amended First Agreement, the Second Agreement required Plaintiff GPTP to pay the Enterprise, through Defendant PAZ, a substantial deposit in order to secure its purchase of the Gloves.  In accordance with the Second Agreement, on February 2, 2021, Plaintiff UC SOLUTIONS caused an additional $1,178,100.00 to be wired to Defendant PAZ.  A copy of the receipt for this wire is attached hereto as **Exhibit H**.

48.    As of February 2, 2021, Plaintiffs had paid a total of $1,984,050.00 to the Defendants for the Gloves, which was equivalent to the cost of six (6) containers of Gloves.  At that point, none of the containers had arrived in port, and Plaintiffs had not yet received or had an opportunity to inspect any of the Gloves.

49.    On February 5, 2021, after months of delay and three (3) days after signing the Second Agreement, two (2) of the four (4) containers of Gloves that Plaintiffs had purchased in December 2020 as part of the Amended First Agreement arrived in port.  However, Plaintiffs quickly learned that the containers did not contain the powder-free, nitrile Gloves that Plaintiffs

had purchased, but instead they contained an inferior product.  This fact was confirmed during Plaintiff's physical inspection of the Gloves on February 5, 2021.  As such, Plaintiffs rejected all four (4) containers of Gloves consistent with the Amended First Agreement's terms.

### *The Enterprise's Attempt to Cover-up Its Fraudulent PPE Scheme*

50.     Plaintiffs were furious with the Defendants after it was forced to reject all four (4) containers of Gloves.  The Plaintiffs had committed themselves to selling powder-free, medical-use nitrile gloves to municipalities and entities throughout the United States, and they were in serious risk of losing out on these contracts if they could not deliver.

51.     To avoid Plaintiffs from pulling the plug on its business dealings with the Enterprise at that time, however, the Defendants lied to Plaintiffs and claimed that they had been duped by the manufacturers.   The Defendants also represented that they had already shifted the manufacturing of the ten (10) containers purchased under the Second Agreement to a "superior" facility in Thailand.  These misrepresentations and false promises were knowingly and maliciously made with the specific intent to continue defrauding Plaintiffs and further induce them into the Enterprise's fraudulent PPE scheme.

52.     Plaintiff GPTP was reluctant to continue doing business with the Defendants at that time, but in order to further induce Plaintiffs to fund the Enterprise's PPE fraud, Defendant SHAPIRO executed a personal guarantee for ten (10) containers of conforming Gloves (the "Personal Guarantee").  A copy of the Personal Guarantee from Defendant SHAPIRO is attached hereto as **Exhibit I**.

53.     At the time Defendant SHAPIRO executed the Personal Guarantee, he was aware that the Defendants could not and would not procure conforming Gloves.  The Personal Guarantee was executed by Defendant SHAPIRO for the specific purpose of further defrauding the Plaintiffs.

54.     In addition to the Personal Guarantee, the Defendants offered to replace the four (4) rejected containers with four (4) additional containers from the "superior" Thailand manufacturer, and the Enterprise offered to return $115,200 to Plaintiffs by reselling the four (4) containers of non-conforming Gloves at $28,800 per container.  Neither of these events ever occurred and were additional misrepresentations made by Defendants SHAPIRO and V. LEYBEL in furtherance of the Enterprise's racketeering activity.

55.     Throughout February and March 2021, GPTP followed up with the Defendants for the anticipated delivery of the ten (10) containers purchased under the Second Agreement, but the Defendants claimed that the shipments were delayed.  The PPE market was still hot, and the delayed delivery of the Gloves compounded the impact of the non-conforming containers that arrived in February.  Since that time, GPTP had entered into several agreements to provide third parties with conforming Gloves based on Defendants' representations, and it was in jeopardy of losing those contracts due to the failure of the Defendants to provide Plaintiffs with anything they had paid for.

56.     The Enterprise, through Defendants CAST GROUP and PAZ, made excuses as to why the ten (10) containers were not arriving from Thailand, pointing the finger at their manufacturing partners overseas.  To try and deflect Plaintiffs' inquiries, the Cast-Paz Enterprise, through Defendants SHAPIRO and V. LEYBEL, provided Plaintiffs with a bogus bill of lading, dated April 3, 2021, which misrepresented and fraudulently indicated that two (2) containers would arrive from Thailand in April with subsequent deliveries following.  Those containers never arrived in April, and Plaintiff subsequently learned that the bill of lading was forged and was fraudulently created by the Enterprise.  As it turns out, the containers had never even left the port

in Thailand.  A copy of the bogus bill of lading provided to Plaintiffs is attached hereto as **Exhibit J**.

### *The Enterprise's Sale of Fraudulent JR Medic Gloves*

57.     During that same period but prior to Plaintiffs learning about the bogus bill of lading for the ten (10) containers of Gloves, the Enterprise, through Defendants CAST GROUP and PAZ, advised Plaintiffs that it had established another new relationship with a supplier, JR Medical Technology Suzhou Co. LTD. ("JR Medic"), that manufactured blue, JR Medic Nitrile Exam Gloves ("JR Medic Gloves") that met the needs of Plaintiff GPTP.

58.     In furtherance of this representation, the Enterprise provided GPTP with letters of authorization as well as marketing materials concerning JR Medic Gloves.  Based on the information provided – which was later discovered to be forged and fraudulent – GPTP obtained a formal opinion from its own FDA counsel, confirming that the JR Medic Gloves that were being proposed for sale to GPTP had received FDA clearance and that GPTP, therefore, could sell those type of gloves to its buyers, including medical users.  A copy of the fraudulent materials provided to GPTP by the Defendants are attached hereto collectively as **Exhibit K.**

59.     Due to the ongoing nature of the Covid-19 pandemic, demand for PPE was still high in March 2021.  Since the Plaintiffs were still unaware of the fraudulent PPE scheme and they still had an opportunity to fulfill a municipal contract for Gloves, they relied on Defendants' representations that they could procure the JR Medic Gloves and entered into three (3) additional purchase contracts with the Enterprise.

60.     On March 21, 2021, the first of the three (3) purchase agreements for JR Medic Gloves was entered into between the parties.  In this one, the Enterprise agreed to sell Plaintiff GPTP 29,700 boxes of blue JR Medic Gloves for $314,820.00 ($10.60 per box).  To induce a

reluctant GPTP into remitting it additional funds, the Enterprise offered to credit GPTP $57,600.00 for the delays caused by the two (2) containers of nonconforming goods that arrived under the First Agreement.  A copy of the Third Agreement is attached hereto as **Exhibit L**.

61.     Pursuant to the terms of the Third Agreement, Plaintiff UC SOLUTIONS wired funds in the amount of $257,220.00 to Defendant PAZ, bringing the total amount wired to the Enterprise at that time up to $2,241,270.00.  A copy of the receipt for this wire is attached hereto as **Exhibit M**.

62.     On March 26, 2021, the parties executed another agreement for the purchase of JR Medic Gloves, wherein the Enterprise, through Defendant CAST GROUP, agreed to sell another 59,400 boxes of JR Medic Gloves to Plaintiff GPTP for $629,640.00 ($10.60 per box) (the "Fourth Agreement").  Under the Fourth Agreement, payment was to be made in installments – 80% following issuance of bills of lading and "SGS/TUV test results;" and 20% upon inspection of the product.  A copy of the Fourth Agreement is attached hereto as **Exhibit N**.

63.     Shortly after signing the Fourth Agreement, the Enterprise, through Defendants CAST GROUP and PAZ, approached Plaintiff GPTP and claimed that it was once again experiencing "cash flow issues," and that these issues could prevent the containers of JR Medic Gloves from leaving China.  The Enterprise represented that it needed Plaintiff GPTP to advance to it $314,820.00, which were the purported costs related to one (1) full container of JR Medic Gloves.  In order to try and avoid this scenario, Plaintiff GPTP agreed to amend the Fourth Agreement and entered into the Amended Fourth Agreement on April 1, 2021 (the "Amended Fourth Agreement").  A copy of the Amended Fourth Agreement is attached hereto as **Exhibit O**.

64.     Under the Amended Fourth Agreement, Plaintiff GPTP agreed to pay 100% of the total purchase price of the first container, $314,820.00, to Defendant PAZ when the draft bills of

ladings and SGS/TUV test results were received for the second container.  Plaintiff GPTP would then pay $188,892.00 to Defendant PAZ upon issuance of draft bills of ladings and SGS/TUV test results for the third container of JR Medic Gloves.  Finally, Plaintiff GPTP would pay the remaining $125,928.00 upon  inspection and acceptance of the third container of JR Medic Gloves. *See* Exhibit O.

65.     Pursuant to the Amended Fourth Agreement, Plaintiff UC SOLUTIONS issued another wire to Defendant PAZ on April 2, 2021, this time in the amount of $314,820.00.  At this point, the Plaintiffs had deposited a total of $2,556,090.00 with the Enterprise for the purchase of the Gloves and the JR Medic Gloves.  A copy of the receipt for the April 2, 2021 wire is attached hereto as **Exhibit P**.

66.     Since Plaintiff GPTP still had opportunities to sell Gloves throughout the United States and was still unaware of the Enterprise's fraudulent PPE scheme, it entered into another purchase agreement for JR Medic Gloves.  On April 13, 2021, Plaintiff GPTP initially contracted with Defendant CAST GROUP for the purchase of an additional 148,500 boxes of blue JR Medic Gloves for $1,574,100.00 (the "Fifth Agreement").  However, since Plaintiff GPTP had certain obligations to fulfill with its own customers, the parties amended the Fifth Agreement the next day and increased the number of boxes to 224,000 for a total of $2,374,400.00 (the "Amended Fifth Agreement").  A copy of the Fifth Agreement is attached hereto as **Exhibit Q**, and a copy of the Amended Fifth Agreement is attached hereto as **Exhibit R**.

67.     On April 15, 2021, pursuant to its obligations under the Amended Fifth Agreement, Plaintiff UC SOLUTIONS wired the Enterprise, via Defendant PAZ, another $479,756.00, bringing the total amount deposited with the Enterprise to $3,035,846.00.  Copies of the receipts for these wires are attached hereto collectively as **Exhibit S**.

### *Discovery of Fraudulent Scheme Involving JR Medic Gloves*

68.     When the first container of JR Medic Gloves arrived at the Port of Long Beach in late April 2021, Plaintiffs began to unravel and discover the Enterprise's fraudulent PPE scheme. Despite the Defendants' repeated promises and representations about the quality of the JR Medic Gloves purchased by Plaintiff GPTP, it was immediately clear that the gloves that had been delivered to Plaintiff GPTP by the Defendants were non-conforming and illegitimate.

69.     Since the parties had agreed that Plaintiffs would not take possession of the JR Medic Gloves unless and until they passed testing by a third-party lab, Plaintiffs immediately sent samples of the JR Medic Gloves to the Akron Rubber Development Laboratory, Inc. to be tested. On April 27, 2021, the JR Medic Gloves failed inspection and, as a result, Plaintiff GPTP's municipal customer terminated its agreement with Plaintiff GPTP.  Plaintiff GPTP likewise rejected the non-conforming JR Medic Gloves and all future deliveries of JR Medic Gloves.

70.     After the JR Medic Gloves failed inspection, Plaintiffs re-inspected the documents that had previously been provided to them by the Enterprise pertaining to the JR Medic Gloves. During this investigation, Plaintiffs discovered that both the documents and the JR Medic Gloves themselves were illegitimate.  Not only were they not actual, authentic "JR Medic Gloves," but the gloves were repacked products manufactured by an unauthorized third party.  According to documents signed by the JR Medic Malaysian parent company, these gloves were never even manufactured in the JR Medic factory, despite being fraudulently packaged in JR Medic boxes. Copies of those documents are attached hereto collectively as **Exhibit T**.

### *The Shandong and Hebei Agreements*

71.     After Plaintiffs uncovered the fraud surrounding the JR Medic Gloves, the Enterprise leveraged Defendant SHAPIRO's status as a lawyer and tried to avoid immediate

litigation with the Plaintiffs over its failure to procure any acceptable Gloves or JR Medic Gloves. In this regard, the Enterprise, through Defendants SHAPIRO and V. LEYBEL, represented to Plaintiffs that the Defendants would use the money it had received from the Plaintiffs to acquire "A+ Plus Nitrile Examination Gloves" (the "A+ Gloves"), which they represented was a brand of medical-use nitrile glove owned by an affiliate of the Enterprise.

72.     Plaintiff GPTP had little faith that the Defendants would deliver on its representations, but in order to try and avoid litigation and mitigate its exposure to its own clients, Plaintiff GPTP entered into two (2) additional agreements with members of the Enterprise for the purchase of A+ Gloves.

73.     The first agreement for A+ Gloves was executed June 24, 2021, between Plaintiff GPTP, on the one hand, and Defendants CAST GROUP and PAZ, on the other hand (the "Shandong Agreement").  Under the Shandong Agreement, Defendants CAST GROUP and PAZ committed to deliver to Plaintiff GPTP eight (8) containers, or 256,000 boxes, of blue, A+ Gloves, in a variety of sizes and of 4+ mil. thickness.  The Enterprise, through Defendants SHAPIRO and V. LEYBEL, represented to Plaintiffs that they had "the ability to procure and deliver" the A+ Gloves and that there was "no restriction whatsoever on the free distribution/sale/trade" of the A+ Gloves.  Defendants PAZ and CAST GROUP granted GPTP a security interest in the product, which GPTP perfected.  A copy of the Shandong Agreement is attached hereto as **Exhibit U**.

74.     The total price for the A+ Gloves in the Shandong Agreement was $2,304,000.00, which was to be paid with previously deposited sums upon Plaintiff GPTP's acceptance of the goods.  The Defendants agreed to be "responsible for all insurance of 100% of the value of the Product until it is physically moved from the production location to Buyer's designated location." *See* Exhibit U.

75.     The second agreement for A+ Plus Gloves was executed between the parties on June 29, 2021 (the "Hebei Agreement").   Under the Hebei Agreement, Respondents CAST GROUP and PAZ committed to deliver to Plaintiff GPTP one (1) container, or 32,000 boxes, of the A+ Gloves at $9 per box.   Once again, the Enterprise, through Defendants CAST GROUP and PAZ, represented to Plaintiffs that they had "the ability to procure and deliver" the A+ Gloves and that there was "no restriction whatsoever on the free distribution/sale/trade" of the A+ Gloves. Further, Defendants CAST GROUP and PAZ granted Plaintiff GPTP a security interest in the product, which Plaintiff GPTP perfected.   A true and correct copy of the Hebei Agreement is attached as **Exhibit V**.

### *Plaintiffs Discovery of the Cast-Paz Enterprise and the Injury Caused by Its Pattern of Racketeering Activity and PPE Scheme*

76.     The efforts of the Plaintiffs to mitigate their substantial losses through the Shandong Agreement and the Heibei Agreement were unsuccessful, just like all of its other endeavors with the Enterprise over the previous seven (7) months.   However, it was not until these agreements went unfulfilled that the Plaintiffs finally uncovered the existence of the Enterprise and the extent of its fraudulent PPE scheme.

77.     Although the A+ Gloves from the Shandong Agreement were ostensibly conforming, none of the other representations made by the Defendants in the agreement were true. The A+ Gloves from the Shandong Agreement were restricted, and despite Plaintiff GPTP perfecting its security interest in the containers that Defendants CAST GROUP and PAZ had sold to it, Defendants CAST GROUP and PAZ did not actually deliver the containers to Plaintiff GPTP.

78.     Upon information and belief, the Enterprise, through Defendants CAST GROUP and PAZ, had granted a security interest to another entity that had provided the Enterprise with the funding they needed to purchase those very A+ Gloves.   Upon further information and belief, that

lender then seized the A+ Gloves at the port, because the Enterprise had failed to pay it back.  Upon information and belief, that lender continues to hold those A+ Gloves in a warehouse in the Los Angeles County area.

79.     In addition, the Enterprise actively prevented Plaintiff GPTP from taking possession of the one (1) container of A+ Gloves that it had purchased under the Hebei Agreement. Upon information and belief, that container of gloves is presently stored at Midas Express Los Angeles, Inc. ("Midas Express") in Los Angeles, California.  Upon information and belief, the Enterprise has specifically directed Midas Express to prevent Plaintiff GPTP from accessing and obtaining that container of A+ Gloves, intentionally exacerbating the Plaintiffs' damages and injuries sustained as a result of the Enterprise's fraud.

80.     As a direct and proximate result of the Cast-Paz Enterprise's fraudulent PPE scheme, the Plaintiffs have, at minimum, sustained combined damages in excess of $3,558,566.00 (excluding interest thereon, costs, or treble damages pursuant to 18 U.S.C.§ 1964(c)).

81.     Plaintiff UC SOLUTIONS has been damaged in an amount of no less than $3,035,846.00, which is the total amount of funds it wired to the Cast-Paz Enterprise as a result of its pattern of racketeering activity.

82.     Plaintiff GPTP, which was created as the successor-in-interest to Plaintiff PROTECTIVE APPAREL prior to the execution of the Second Agreement, sustained total damages in excess of $522,544.00 from its failure to fulfill its contractual obligations with several vendors, including World Tech Toys, Inc. and LA County, when it failed to supply them with medical-use nitrile gloves.  Significantly, with respect to Plaintiff GPTP's agreement with World Tech Toys, Inc., Defendant SHAPIRO, through Defendant SHAPIRO & ASSOCIATES, agreed to serve as the escrow agent for the deal and, therefore, was specifically aware what Plaintiff GPTP

expected to resell the Gloves to World Tech Toys, Inc. for, which was $12.80 per box.  Plaintiffs had paid the Cast-Paz Enterprise $10.60 per box, and Plaintiff GPTP had agreed to sell World Tech Toys, Inc. a total of 237,520 boxes of JR Medic Gloves.  A copy of the Sales and Purchase Agreement between Plaintiff GPTP and World Tech Toys, Inc. is attached hereto as **Exhibit W.**

### *Ongoing Arbitration and Litigation*

83.     Defendant SHAPIRO refused to fulfill the obligations under the Personal Guarantee, and the Enterprise failed to deliver to Plaintiffs any of the Gloves, JR Medic Gloves, or A+ Gloves that they paid for.  As such, on August 16, 2021, Plaintiff GPTP gave Defendants SHAPIRO, CAST GROUP, and PAZ notice of default and an opportunity to cure.  A copy of the August 16, 2021 letter is attached hereto as **Exhibit W.**

84.     The Defendants failed to cure its defaults, and, on or about September 9, 2021, GPTP filed a Demand for Arbitration with the AAA (the "Arbitration").  The claims asserted by Plaintiff GPTP in its Demand for Arbitration include: (1) Breach of Contract – Breach of Amended First Agreement; (2) Breach of Contract – Breach of Second Agreement; (3) Breach of Contract – Breach of Third Agreement; (4) Breach of Contract – Breach of Amended Fourth Agreement; (5) Breach of Contract – Breach of Amended Fifth Agreement; (6) Breach of Contract – Breach of Shandong Agreement; (7) Breach of Contract against Saadia Shapiro – Breach of Personal Guarantee; (8) Fraudulent Inducement; (9) Unjust Enrichment; and (10) Intentional Interference with Prospective Economic Advantage.  The Arbitration is pending in the State of California[6], and it is currently scheduled for a hearing to occur in or around March 2023.

---

[6] A special proceeding was commenced by Defendants SHAPIRO and PAZ under CPLR Article 75 in New York County Supreme Court (Index No. 655966/2021) on October 15, 2021, which unsuccessfully requested the venue of the arbitration be moved from California to New York.  A Notice of Appeal has been filed with respect to that decision, but an appeal has not been perfected as of the date of this Complaint.

85.     Since uncovering the Cast-Paz Enterprise's fraudulent PPE scheme, Plaintiff GPTP has learned of several other groups of investors that were defrauded as part of its common purpose. This includes a group and an investor named MSV Synergy, LLC and Mark Barron, respectively, who have commenced litigation against several of the Defendants in federal court in the Southern District of New York (*MSV Synergy, LLC, et al v. Saadia Shapiro, et al.*, S.D.N.Y. Case No. 1:21-cv-070578). Upon information and belief, that matter involves the same fraudulent PPE scheme perpetrated against Plaintiffs herein, and it is currently pending in arbitration.

86.     Further, Defendant CAST CAPITAL, Defendant BMV, Defendant PROSPERITAS, Defendant SHAPIRO, Defendant PEREMAN, Defendant V. LEYBEL, and Defendant B. LEYBEL were named in a civil RICO lawsuit filed in the United States District Court for the Southern District of New York in 2022 (*US Information Group, LLC, et al. v. EBF Holdings, LLC (d/b/a Everest Business Funding d/b/a EBF), et al.*, S.D.N.Y. Case No. 1:22-cv-06661). Upon information and belief, the Defendants in that matter are accused of violating 18 U.S.C. § 1962(b) by engaging in a pattern of racketeering activity and fraud that involved usurious loans and which was perpetrated by an association-in-fact enterprise that included Defendants CAST CAPITAL, BMV, SHAPIRO, PEREMAN, V. LEYBEL, and B. LEYBEL.

87.     Upon information and belief, since the onset of the Arbitration, Defendants SHAPIRO, V. LEYBEL, and B. LEYBEL have attempted to transfer and hide their assets in order to render any arbitration award or court judgment rendered against them or the other members of the Enterprise ineffectual. As such, on October 5, 2022, Plaintiff GPTP filed a special proceeding in the New York State Supreme Court for Kings County, seeking, *inter alia*, an attachment in aid of arbitration pursuant to Article 75 of New York's Civil Practice Law and Rules, against Defendant SHAPIRO, Defendant V. LEYBEL, Defendant B. LEYBEL, Defendant PAZ,

Defendant REBOUND, and non-party entity, Maple Street, LLC, which ostensibly owns Defendant SHAPIRO's New Jersey residence (*GP Trading Partners, LLC v. Saadia Shapiro, et al.*, Kings County Index No. 528987/2022).

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS:
### Participation in an Unlawful Enterprise Through a Pattern of Racketeering Activity – Violation of RICO, 18 U.S.C. § 1962(c)

88.     Plaintiffs repeat, reiterate, and reallege the allegations set forth in Paragraphs "1" through "87" of this Complaint with the same force and effect as though more fully set forth herein.

89.     Plaintiffs hereby incorporates by reference the allegations and appendices attached to Plaintiffs' RICO Case Statement, which is required to be filed contemporaneously with the Complaint pursuant to Local Rule 9 of the Local Rules of Civil Procedure for the United States District Court for the Western District of New York.

90.     Plaintiffs are "persons" as defined by 18 U.S.C. § 1961(3) of RICO statute.

91.     Each and every Defendant is a "person" as defined by 18 U.S.C. § 1961(3) of RICO.

92.     The Defendants have each have engaged, associated, and participated in the Cast-Paz Enterprise, which engaged in interstate commerce through a pattern of racketeering activity that includes more than sixty (60) instances of "racketeering activity" as defined by 18 U.S.C. § 1961(1).  Each Defendant has engaged in at least two predicate acts or racketeering activity, at least one of which occurred within ten (10) years of the commission of a prior act of racketeering activity.

93.     Attached hereto as **Exhibit Y** is Plaintiff's Predicate Acts Chart, which is also attached to Plaintiff's RICO Case Statement as Appendix A.  It sets forth sixty-two (62) instances of racketeering activity that Plaintiffs are aware of at this time, and each instance is identified in the Predicate Acts Chart which includes the date of the alleged misconduct, the perpetrator(s) of

such misconduct, the victim(s) of such misconduct, and a description of the conduct and the role it played toward furthering the Cast-Paz Enterprise's fraudulent PPE scheme.

94.    At all times relevant to the above allegations, all Defendants had an ongoing business relationship whereby they solicited funds and entered into sales and purchase agreements with PPE suppliers during the Covid-19 pandemic based on intentional and fraudulent misrepresentations regarding the quality, grade, and source of PPE they could procure.   The business relationships between the Defendants, which are outlined in flowchart set forth in Paragraph 26, constitute an "association in fact" enterprise within the meaning of 18 U.S.C. § 1961(4) of RICO[7].

95.    In their intentional scheme to defraud Plaintiffs, each and every Defendant engaged in activities that constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) of RICO, include, but are not limited to, the following:

i.    At least eight (8) counts of violating 18 U.S.C. § 2315 (relating to the sale of counterfeit goods);

ii.    At least ten (10) counts of violating 18 U.S.C. § 1956 (relating to the laundering of monetary instruments);

iii.    At least six (6) counts of violating 18 U.S.C § 2314 (relating to the transportation of counterfeit goods);

iv.    At least three (3) counts of violating 18 U.S.C. § 2318 (relating to trafficking in counterfeit labels, documentation, or packaging);

v.    At least three (3) counts of violating 18 U.S.C. § 2320 (relating to trafficking in counterfeit goods);

vi.    At least one (1) count of violating 18 U.S.C. § 1341 (relating to mail fraud); and

---

[7] As referenced in Plaintiffs' RICO Case Statement, Defendant CAST CAPITAL qualifies as an alternative "enterprise" under 18 U.S.C. § 1961(4), because its ownership structure associates the individual Defendants and the legal entity Defendants in fact.

vii.   At least thirty-one (31) counts of violating 18 U.S.C. § 1343 (relating to wire fraud).

*See*, Exhibit Y.

96.     The Defendants' racketeering activities in furtherance of the common purpose of the Cast-Paz Enterprise caused substantial and direct injury to Plaintiffs in an amount of no less than $3,558,390.00, excluding interest thereon or penalties, which is comprised of the $3,035,846.00 paid to the Cast-Paz Enterprise by Plaintiff UC SOLUTIONS, and $522,544.00 in lost business opportunity by virtue of Plaintiff GPTP having its contract with non-party World Tech Toys, Inc. cancelled due to the Cast-Paz Enterprise's racketeering activity.

97.     By virtue of the Defendants' violations of 18 U.S.C. § 1962(c), the Plaintiffs are entitled to recover treble damages against the Defendants, as well as the costs associated with bringing this action, including reasonable attorney's fees, pursuant to 18 U.S.C. § 1964(c).

98.     As such, the Plaintiffs demand judgment against the Defendants in an amount of no less than $10,675,170.00, together with pre-judgment interest thereon, and the costs of this action, including reasonable attorney's fees.

**AS AND FOR A SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS:**
**Conspiracy to Violate RICO in Violation of 18 U.S.C. § 1962(d)**

99.     Plaintiffs repeat, reiterate, and reallege the allegations set forth in Paragraphs "1" through "98" of this Complaint with the same force and effect as though more fully set forth herein.

100.     Plaintiffs hereby incorporates by reference the allegations and appendices attached to Plaintiffs' RICO Case Statement, which is required to be filed contemporaneously with the Complaint pursuant to Local Rule 9 of the Local Rules of Civil Procedure for the United States District Court for the Western District of New York.

101.    Upon information and belief, on or about August 31, 2020, Defendants SHAPIRO, PEREMAN, V. LEYBEL, and B. LEYBEL, individually and through their corporate entities, conspired to perpetrate a fraudulent PPE scheme, and they modified the operating agreement of Defendant CAST CAPITAL to allow it to serve as their common corporate entity.  An unsigned copy of the shareholders' agreement for Defendant CAST CAPITAL is attached hereto as **Exhibit Z**.

102.    By November 2020, the conspiratorial plans were in motion, and Defendants PAZ and CAST GROUP were acquiring fraudulent PPE, including the non-medical grade nitrile gloves it attempted to pass off and sell to Plaintiffs as the medical-grade Gloves.

103.    The Defendants, individually and on behalf of their respective entities, conspired to violate RICO, which itself is a violation of 18 U.S.C. § 1962(d) of RICO.

104.    The Defendants' conspiracy to violate RICO caused substantial and direct injury to Plaintiffs in an amount of no less than $3,558,390.00, excluding interest thereon or penalties, which is comprised of the $3,035,846.00 paid to the Enterprise by Plaintiff UC SOLUTIONS, and $522,544.00 in lost business opportunity by virtue of Plaintiff GPTP having its contract with non-party World Tech Toys, Inc. cancelled due to the Cast-Paz Enterprise's racketeering activity.

105.    By virtue of the Defendants' violations of 18 U.S.C. § 1962(d), the Plaintiffs are entitled to recover treble damages against the Defendants, as well as the costs associated with bringing this action, including reasonable attorney's fees, pursuant to 18 U.S.C. § 1964(c).

106.    As such, the Plaintiffs demand judgment against the Defendants in an amount of no less than $10,675,170.00, together with pre-judgment interest thereon, and the costs of this action, including reasonable attorney's fees.

**WHEREFORE**, the Plaintiffs respectfully request that this Court issue an Order and Judgment, pursuant to 18 U.S.C. § 1964(c), awarding the Plaintiffs an amount of no less than $10,675,170.00 as treble damages against the Defendants, jointly and severally, together with pre-judgment interest thereon, for their violations of 18 U.S.C. §§ 1962(c) and (d); together with the costs and disbursements of this action, including reasonable attorney's fees; and such other and further relief  it deems just and proper.

Dated: Buffalo, New York
           November 17, 2022

                    **THE TARANTINO LAW FIRM, LLP**


               By: */s/ Nicholas P. DeMarco*
                    Nicholas P. DeMarco, Esq.
                    *Attorneys for Plaintiffs*
                    City Centre
                    610 Main Street, Suite 300
                    Buffalo, New York 14202
                    (716) 849-6500
                    ndemarco@tarantinolaw.com