UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UC SOLUTIONS, LLC, *et al.*,

    Plaintiffs,

v.

SAADIA SHAPIRO, *et al.*,

    Defendants.

22-CV-892-LJV
ORDER

---

On November 18, 2022, the plaintiffs—UC Solutions, LLC ("UC Solutions"); GP Trading Partners, LLC ("GPTP"); and Protective Apparel, LLP ("Protective Apparel")—commenced this action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Docket Item 1. They alleged that the defendants—Saadia Shapiro; Vadim Leybel ("V. Leybel"); Boris Leybel ("B. Leybel"); Eric Pereman; Cast Group, LLC ("Cast Group"); Paz Global Ventures, LLC ("Paz"); Cast Capital Lending Corp. ("Cast Capital"); BMV Equities, LLC ("BMV"); Prosperitas Capital, LLC ("Prosperitas"); Shapiro & Associates Attorneys at Law, PLLC ("Shapiro & Associates"); and Rebound Holdings, LLC ("Rebound")—sold them "non-medical grade" personal protective equipment ("PPE") during the COVID-19 pandemic as part of a "fraudulent PPE scheme." *Id.*

Several defendants then moved to dismiss the claims against them on various grounds, including improper venue.[1] Docket Item 11 (B. Leybel); Docket Items 12, 15, 19 (Shapiro); Docket Items 13-14 and 16-17 (Paz, Rebound, and Shapiro & Associates); Docket Item 39 (BMV, Cast Capital, Cast Group, and V. Leybel). As an

---

[1] Defendants Prosperitas and Pereman have not yet appeared.

alternative to dismissal, some defendants asked that this case be transferred to another district.  *See* Docket Item 14 at 24-27.

The defendants' motions now are fully briefed.  *See* Docket Items 11-68.  For the reasons that follow, this action is transferred to the United States District Court for the Southern District of New York.

# BACKGROUND[2]

Over the course of about 10 months in 2020 and 2021, the defendants "induced" the plaintiffs into entering "numerous written agreements . . . for the purported purchase of" medical-grade nitrile gloves, a type of PPE.  Docket Item 1.  The plaintiffs paid the defendants $3,035,846.00 over that time, but the plaintiffs never received most of the gloves they had purchased, and the gloves they did receive did not meet the agreed-upon specifications.  *Id.*  In fact, the defendants "never intended on procuring any [g]loves for the [p]laintiffs."  *Id.*  The plaintiffs now assert that the defendants participated in an unlawful enterprise in violation of RICO.  *Id.*

## I.   THE PARTIES

The plaintiffs are three businesses.  GPTP is "a Delaware limited liability company with a principal place of business in Los Angeles, California."  *Id.* at ¶ 8.  It

---

[2] When deciding a motion asserting improper venue, the court accepts the factual allegations in the complaint and construes the facts in the "light most favorable to the plaintiff."  *Ambac Assurance Corp. v. Adelanto Pub. Util. Auth.*, 696 F. Supp. 2d 396, 399 (S.D.N.Y. 2010); *see Bartosiewicz v. Nelsen*, 564 F. Supp. 3d 287, 292 (W.D.N.Y. 2021) (for purposes of motion to dismiss for lack of personal jurisdiction and improper venue, "the Court treats [p]laintiff's factual allegations as true").  The following facts are taken from the complaint, Docket Item 1, and the documents attached to the complaint.

"distributes PPE, including nitrile gloves, to clients throughout the United States."  *Id.*  Protective Apparel, GPTP's "predecessor-in-interest," also is "a Delaware limited liability company with a principal place of business in Los Angeles."  *Id.* at ¶ 9.  And UC Solutions, a "member" of GPTP, is "a Virginia limited liability company with a principal place of business" in "Buffalo, New York."  *Id.* at ¶ 7.

The four individual defendants—Shapiro, V. Leybel, B. Leybel, and Pereman—reside in New Jersey.  *Id.* at ¶¶ 10-13.  The seven business entity defendants—which include five limited liability companies (Cast Group, Paz, BMV, Prosperitas, and Rebound), one corporation (Cast Capital), and one professional service limited liability company (Shapiro & Associates)—are incorporated or registered under the laws of New York or New Jersey and have principal places of business in New York City or New Jersey.  *Id.* at ¶¶ 14-20.  Each business entity defendant is owned or operated by some combination of the individual defendants or their other businesses.  *Id.*

## II.     THE INITIAL AGREEMENTS

In November 2020, the plaintiffs were "introduced to a 'group' out of New York" led by Shapiro and V. Leybel.  *Id.* at ¶ 30.  Shapiro and V. Leybel "represented" that the group—which consisted of the individual and business entity defendants, *see id.* at ¶ 2—"could procure blue, powder-free nitrile gloves . . . that were medical-grade and at least 4 [millimeters] thick," *id.* at ¶ 30.  To prove that they could procure the gloves, the defendants provided "sham sample materials and phony 'references' from the alleged manufacturers" of the gloves.  *Id.* at ¶ 32.  "[O]ne such reference was from [Pereman], who . . . intentionally misrepresented to [the plaintiffs] who he was and what [g]loves the [defendants could] procure."  *Id.*

3

"Based on these initial fraudulent representations, on or about December 8, 2020," the plaintiffs entered into a sales and purchase agreement (the "first agreement") with the defendants.  *Id.* at ¶ 34; *see* Docket Item 1-1.  Under the first agreement, Protective Apparel agreed to pay Cast Group $1,476,000.00 for four containers—or 144,000 boxes—of the gloves.  Docket Item 1 at ¶ 34.  Until the gloves could be inspected, "payments were to be held in escrow" by Shapiro in "the IOLA account maintained by" Shapiro & Associates.[3]  *Id.* at ¶ 35.  So on December 9 and 28, 2020, UC Solutions "wired a total of $701,100.00" to Shapiro & Associates.  *Id.* at ¶ 37 & n.5.

In January 2021, Shapiro and V. Leybel falsely "indicated to the [p]laintiffs that their financing had run out and that they needed additional cash to complete the purchase of the [g]loves."  *Id.* at ¶ 39.  They proposed that the plaintiffs "release the $701,100.00 being held in escrow" and "pa[y] a larger deposit, this time directly to [Paz] instead of into escrow."  *Id.* at ¶ 40.  The plaintiffs "agreed to the proposal," and on January 11, 2021, the parties amended the first agreement to reflect the updated terms.  *Id.*  The next day, UC Solutions wired $104,850.00 to Paz.  *Id.* at ¶ 41.

The gloves purchased in the first agreement were "projected" to arrive in the United States by January 15, 2021.  *Id.* at ¶ 45.  The gloves did not arrive on time, but shipping delays were "not unusual" during the pandemic.  *Id.*  Additionally, Shapiro and

---

[3] An "IOLA" account is an "Interest on Lawyer Account Fund."  *See* "Interest on Lawyer Account Fund of the State of New York," IOLA, https://www.iola.org/all-documents/enrollment/143-lawyer-s-guide-to-iola-accounts-nov-2019/file (last visited Feb. 8, 2024) (explaining that when attorneys "receive third party funds to be held in trust for future use," they "customarily deposit[] the money in an interest-bearing account in the name of, and for the benefit of, the third party").  The plaintiffs believe that Shapiro "intentionally directed that the[] funds be deposited into his law firm's IOLA account in an effort to comingle the funds and avoid any subsequent attachment or seizure."  Docket Item 1 at ¶ 36.

4

V. Leybel "represented" that all four containers of the gloves "would be arriving in port within a few weeks"—even though they knew very well "that only [two of the four] containers were actually in transit at the time." Id.

While they waited for the first shipment of gloves to arrive, the plaintiffs and the defendants entered into another agreement on February 2, 2021 (the "second agreement"). Id. at ¶ 46; see Docket Item 1-7. Under the second agreement, GPTP agreed to pay Cast Group $3,366,000.00 for an additional ten containers—or 330,000 boxes—of gloves meeting the same specifications that were in the first agreement. Docket Item 1 at ¶ 46. Like the first agreement, the second agreement required the plaintiffs to make "a substantial deposit" to secure their purchase. Id. at ¶ 47. So the day the parties signed the agreement, UC Solutions wired another $1,178,100.00 to Paz. Id.

A few days later, two containers of gloves "arrived in port." Id. at ¶ 49. The plaintiffs "quickly learned that the containers did not contain the powder-free, nitrile [g]loves that [they] had purchased, but instead . . . contained an inferior product." Id. The plaintiffs were "furious" because they had "committed" to re-selling the gloves and "were in serious risk of losing out on th[o]se contracts if they could not deliver." Id. at ¶ 50. They therefore "reject[ed] all four . . . containers" purchased under the first agreement. Id. at ¶ 49.

In response, the defendants falsely "claimed that they had been duped by the manufacturers" and "represented that they had already" arranged to obtain gloves for

5

the second agreement from a "'superior' facility in Thailand."[4]  *Id.* at ¶ 51.  The plaintiffs were "reluctant to continue doing business" with the defendants, but Shapiro "executed a personal guarantee for ten . . . containers of conforming [g]loves."  *Id.* at ¶ 52.  The defendants also "offered to replace" the four containers of non-conforming gloves and to "return" $115,200.00 to the plaintiffs.[5]  *Id.* at ¶ 54.

"Throughout February and March 2021," the plaintiffs "followed up with" the defendants, who "claimed that the shipments were delayed."  *Id.* at ¶ 55.  "To try and deflect" the "inquiries," Shapiro and V. Leybel provided "a bogus bill of lading, dated April 3, 2021, which . . . fraudulently indicated that two . . . containers would arrive from Thailand in April with subsequent deliveries following."  *Id.* at ¶ 56.  But the containers never arrived, and the plaintiffs later "learned that the bill of lading was forged."  *Id.*

### III.   THE JR MEDIC GLOVES AGREEMENTS

Before the plaintiffs learned that the bill of lading was forged, however, the defendants told them about another supplier, JR Medical Technology Suzhou Co. Ltd. ("JR Medic"), that manufactured gloves "that met [the plaintiffs'] needs."  *Id.* at ¶ 57.  The defendants provided "letters of authorization" and "marketing materials" suggesting that the JR Medic gloves "had received FDA clearance" and therefore could be sold to the plaintiffs' "buyers."  *Id.* at ¶ 58.  So the plaintiffs "entered into three . . . additional

---

[4] In reality, the plaintiffs say, the defendants knew all along that "they had specifically procured non-medical grade nitrile gloves" that did not meet the agreed-upon specifications.  Docket Item 1 at ¶ 43.

[5] The defendants neither replaced the containers nor returned the money as they had promised.  Docket Item 1 at ¶ 54.

purchase contracts" (the "third," "fourth," and "fifth" agreements) with the defendants. *Id.* at ¶ 59.

Under the third agreement, executed on March 21, 2021, GPTP agreed to pay Cast Group $314,820.00 for 29,700 boxes of JR Medic gloves. *Id.* at ¶ 60; *see* Docket Item 1-12. The defendants "offered to credit" the plaintiffs $57,600.00 for the "delays" caused by the first shipment, Docket Item 1 at ¶ 60, so UC Solutions wired Paz $257,220.00 to cover the rest of the purchase price, *id.* at ¶ 61.

Under the fourth agreement, executed on March 26, 2021, GPTP agreed to pay Cast Group $629,640.00 for 59,400 boxes of JR Medic gloves. *Id.* at ¶ 62; *see* Docket Item 1-14. Shortly after that, the defendants asked the plaintiffs to "advance" $314,820.00 to address purported "cash flow issues" that could interfere with the delivery of the JR Medic gloves. Docket Item 1 at ¶ 63. So the parties amended the fourth agreement, *id.* at ¶¶ 63-64, and UC Solutions wired Paz the requested $314,820.00. *Id.* at ¶ 65.

Under the fifth agreement, executed on April 13, 2021, and amended the next day, GPTP agreed to pay Cast Group $2,374,400.00 for 224,000 boxes of JR Medic gloves. *Id.* at ¶ 66; *see* Docket Items 1-17 and 1-18. So on April 15, 2021, UC Solutions wired Paz a downpayment of $479,756.00. Docket Item 1 at ¶ 67.

In late April 2021—and after UC Solutions had wired the defendants more than $3 million, *id.*—the first container of JR Medic gloves arrived in Long Beach, California, *id.* at ¶ 68. "[I]t was immediately clear that the gloves . . . were non-conforming," *id.*, so the plaintiff "sent samples" of the gloves "to be tested," *id.* at ¶ 69. When the gloves

7

"failed inspection," one of the plaintiffs' "municipal customer[s] terminated its agreement" with the plaintiffs. *Id.*

The plaintiffs "rejected the non-conforming JR Medic [g]loves and all future deliveries" of those gloves. *Id.* They also "re-inspected" the letters of authorization and marketing materials that the defendants had provided and "discovered that both the documents and the JR Medic [g]loves themselves were illegitimate," *id.* at ¶ 70; *see id.* at ¶ 58: The gloves were not "actual, authentic" JR Medic gloves but instead were "repacked products manufactured by an unauthorized third party." *Id.* at ¶ 70.

### IV.     THE A+ GLOVES AGREEMENTS

After the plaintiffs "uncovered the fraud" involving the phony JR Medic gloves, Shapiro and V. Leybel "represented" that the defendants would "use the money [they] had received from the [p]laintiffs to acquire" a different "brand of medical-use nitrile glove[s]": "A+ Plus Nitrile Examination Gloves." *Id.* at ¶ 71. Although the plaintiffs "had little faith that the [d]efendants would deliver," they "entered into two . . . additional agreements" (the "sixth" and "seventh" agreements) in an attempt to "avoid litigation and mitigate [their] exposure." *Id.* at ¶ 72.

Under the sixth agreement, executed on June 24, 2021, GPTP agreed to pay Cast Group and Paz $2,304,000.00 for 256,000 boxes of the A+ Gloves. *Id.* at ¶¶ 73-74; *see* Docket Item 1-21. Shapiro and V. Leybel "represented . . . that they had 'the ability to procure and deliver' the A+ [g]loves and that there was 'no restriction whatsoever on the free distribution/sale/trade'" of the gloves. Docket Item 1 at ¶ 73. The defendants also "granted GPTP a security interest in the product, which GPTP

perfected."  *Id.*  The price of the gloves "was to be paid with previously deposited sums upon . . . acceptance of the goods."  *Id.* at ¶ 74.

Under the seventh agreement, executed on June 29, 2021, GPTP agreed to pay Cast Group and Paz $288,000.00 for 32,000 boxes of the A+ gloves.  *Id.* at ¶ 75; *see* Docket Item 1-22.  The defendants made the same representations that they had made for the sixth agreement, and they again granted GPTP a security interest, which GPTP perfected.  Docket Item 1 at ¶ 75.

Although the A+ gloves purchased under the sixth agreement were "ostensibly conforming," the defendants "did not actually deliver the containers" to the plaintiffs.  *Id.* at ¶ 77.  Instead, the gloves were "seized" by a "lender" with a security interest in the gloves who had "provided . . . the funding [the defendants] needed to purchase" the gloves and who the defendants "failed to pay . . . back."  *Id.* at ¶ 78.  The defendants also "actively prevented" the plaintiffs "from taking possession of" the gloves purchased under the seventh agreement.  *Id.* at ¶ 79.  "[T]hat container of gloves is presently stored" in Los Angeles, and the defendants have "specifically directed" the entity holding the gloves to deny the plaintiffs access to them.  *Id.*

### V.   ARBITRATION AND LITIGATION

In August 2021, the plaintiffs gave the defendants "notice of default and an opportunity to cure" with regard to the various contracts.  *Id.* at ¶ 83.  The defendants "failed to cure [the] defaults," so in September 2021, GPTP filed a demand for arbitration with the American Arbitration Association.  *Id.* at ¶ 84.  It asserted claims for breach of contract, fraudulent inducement, unjust enrichment, and intentional interference with prospective economic advantage.  *Id.*  As of the time the complaint

was filed, the arbitration was pending in California, although Shapiro and Paz unsuccessfully had tried to move it to New York State, *id.* at ¶ 84 & n.6.

Since the arbitration began, Shapiro, V. Leybel, and B. Leybel "have attempted to transfer and hide their asserts in order to render any arbitration award or court judgment rendered against them or the other [defendants] ineffectual." *Id.* at ¶ 87. So in October 2022, GPTP commenced a "special proceeding" against several of the defendants in New York State Supreme Court, Kings County, "seeking, *inter alia*, an attachment in aid of arbitration pursuant to Article 75 of New York's Civil Practice Law and Rules." *Id.*

## **LEGAL PRINCIPLES**

Under 28 U.S.C. § 1391(b), a civil action may be brought in:

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). When a case is filed in a district in which venue is improper, the court "shall dismiss" the case, "or if it be in the interest of justice, transfer such case to any district . . . in which it could have been brought." 28 U.S.C. § 1406(a). "The burden of showing that venue in the forum district is proper falls on the plaintiff." *Ambac*, 696 F. Supp. 2d at 399 (alteration and citation omitted).

**DISCUSSION**

The defendants raise many arguments attacking the sufficiency of the complaint, including arguments that the plaintiffs fail to state a claim and that this action is barred by the related arbitration proceedings. *See generally* Docket Items 11-3, 14, 15, 39-2. But this Court addresses only two threshold questions: Is the Western District of New York the proper venue for this action, and, if not, should this case be dismissed or transferred to another venue?[6]

## I.  PROPER VENUE

The complaint is silent as to the basis for venue in this District. *See* Docket Item 1 at ¶¶ 5-6. But in response to the defendants' motions to dismiss, the plaintiffs assert that venue is proper under section 1391(b)(2) because "a substantial part of the events . . . giving rise to the claim occurred" in this District and because "a substantial part of property that is the subject of the action is situated" in this District. *See* Docket Item 40-9 at 10-12. Several defendants, on the other hand, contend that this action has insufficient ties to the Western District. *See* Docket Item 11-3 at 11-14; Docket Item 39-2 at 12-15. Those defendants are correct.

---

[6] This Court is not the only one to treat venue as a "threshold" issue. *See, e.g.*, *Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, 928 F. Supp. 2d 735, 741 (S.D.N.Y. 2013) (addressing motion to transfer venue before challenge to personal jurisdiction and collecting cases that did the same). Here, the Court addresses venue first as a matter of judicial economy: The defendants' motions to dismiss for failure to state a claim should be decided by a court where venue is proper because, if those motions are denied, that will be the court where this case continues. *See Enigma Software Grp. USA, LLC v. Malwarebytes Inc.*, 260 F. Supp. 3d 401, 408-09, 413 (S.D.N.Y. 2017) (where defendant moved to dismiss for failure to state a claim and also moved to transfer venue, granting motion to transfer venue and declining to rule on motion to dismiss because that motion should be "resolved by the transferee court").

11

Section 1391 "permits venue in multiple judicial districts as long as 'a substantial part' of the underlying events took place in those districts." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356-57 (2d Cir. 2005) (citations omitted). As the Second Circuit has "caution[ed]," however, district courts must "take seriously the adjective 'substantial.'" *Id.* at 357. "'Substantiality' for venue purposes is more a qualitative than a quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432-33 (2d Cir. 2005) (citing *Gulf Ins. Co.*, 417 F.3d at 375).

The plaintiffs argue that there are a few reasons why venue is proper in this District. First, they note that UC Solutions—one of the plaintiffs—is headquartered in Buffalo, where its "sole member" resides. Docket Item 40-9 at 12. Second, they say that UC Solutions "is the entity whose property was actually stolen" by the defendants. *Id.*; *see id.* at 8-9 (arguing that the defendants "stole more than $3 million from . . . UC Solutions, which is headquartered in Buffalo"). And third, they assert that UC Solutions' sole member had "numerous interactions with" the defendants while he lived in Buffalo. *Id.* at 12.

But that is not enough to establish venue. As for the plaintiffs' first two arguments, "a plaintiff's residence"—or, in this case, principal place of business—"is irrelevant in determining venue" under section 1391(b). *See Madison v. Dyal*, 746 F. Supp. 2d 450, 452 (W.D.N.Y. 2010). So the fact that UC Solutions—the plaintiff whose money was allegedly "stolen"—is headquartered in Buffalo is of no moment. And if the plaintiffs intend to suggest that the money allegedly stolen from UC Solutions is a

"substantial part of property" located within this District, *see* 28 U.S.C. § 1391(b)(2), that argument fails because the money allegedly was transferred *out* of this District.[7]

As to the plaintiffs' third argument, the vague assertion that UC Solutions' sole member interacted with the defendants while he lived in Buffalo falls far short of showing that a substantial part of the events giving rise to this case occurred in the Western District of New York. In fact, the plaintiffs do not provide any detail whatsoever about those "interactions." *See generally* Docket Item 40-9. For example, the plaintiffs do not allege meetings or negotiations in the Western District. *See* Docket Item 1. On the contrary, they suggest that the negotiations took place between plaintiffs headquartered in California and defendants in New York City and New Jersey. *See id.*; *see also* Docket Items 1-1, 1-7, 1-12, 1-14, 1-17, 1-21, and 1-22.

Perhaps recognizing that the location of UC Solutions' headquarters cannot alone establish venue, the plaintiffs also note that UC Solutions sent "at least seven" wires to the defendants from its bank, which also is located in the Western District of New York. Docket Item 40-9 at 9, 12. But they do not explain why those wires constitute a "substantial part" of the events underlying this action—which encompasses far more than seven individual wire payments—or cite any case law to support their

---

[7] Indeed, finding otherwise would amount to placing venue where an allegedly defrauded plaintiff resides—and that is not permitted under section 1391. *See Bond Safeguard Ins. Co. v. Ward*, 2009 WL 1370935, at *5 (N.D. Ga. May 14, 2009) (noting that while the cases interpreting the "substantial part of property" portion of section 1391 are "scant," those cases "construe the meaning of [that clause] to apply only to suits involving property disputes or in rem actions[,] not to suits alleging financial damages to a corporation" (alteration and internal quotation marks omitted) (collecting cases)); *see also Astor Holdings, Inc. v. Roski*, 2002 WL 72936, at *9 (S.D.N.Y. Jan. 17, 2002) ("There is an obvious potential for unbounded venue if the courts were to find venue regardless of where the acts occurred, based solely on the existence of economic harm felt in the district where the plaintiff resides or is headquartered.").

13

position that simply wiring money in a case like this can be "substantial."  *See generally* Docket Item 40-9.

B. Leybel, on the other hand, cites several cases suggesting that wire payments are not a "substantial part" of the events at issue.  *See* Docket Item 45 at 8-10.  For example, in *LGN International, LLC v. Hylan Asset Management, LLC*, 2021 WL 3500909 (S.D.N.Y. Aug. 9, 2021), the Southern District of New York considered a motion to dismiss a civil RICO case for improper venue.  The court noted that the "only specific alleged fact tying the [underlying] events" to the Southern District was a "wire transfer" to a Manhattan bank account.  *Id.* at *3.  That allegation was "not enough to support a finding that a *substantial* part of the events giving rise to the claims occurred within the Southern District of New York," so venue was not proper under section 1391(b)(2).  *Id.* (emphasis in original).  Similarly, in *Prospect Capital Corp. v. Bender*, 2009 WL 4907121 (S.D.N.Y. Dec. 21, 2009), the court determined that "in the context of [an] entire RICO claim, a single wire transfer of funds is not a 'substantial act' sufficient to confer venue."  *Id.* at *3.

Admittedly, the plaintiffs here allege that UC Solutions made seven wire payments—not one.  But whether payments are made all at once or in installments is a trivial detail.  And even if that were not true, given "the overall nature" of the plaintiffs' claims, *see Daniel*, 428 F.3d at 432-33, those seven wire transfers were not a "substantial part" of the events giving rise to this case.

The heart of this dispute is the purchase and sales agreements, the negotiations around those agreements, and the defendants' alleged failure to uphold their end of the bargains.  Plaintiff UC Solutions—the only connection to the Western District of New

14

York—is not even a party to any of those agreements, which were made between defendants Cast Group and Paz and plaintiffs Protective Apparel and GPTP. *See* Docket Items 1-1, 1-7, 1-12, 1-14, 1-17, 1-21, and 1-22. What is more, the addresses of the parties to the agreements are listed in the agreements as being in either New York City or Los Angeles—not the Western District of New York. *See* Docket Items 1-1, 1-7, 1-12, 1-14, 1-17, 1-21, and 1-22. So the argument that UC Solutions' payments on behalf of the other plaintiffs—who themselves have no ties to Western New York—constitute a "substantial" tie to this District is unconvincing.

For those reasons, the Court concludes that no "substantial" events giving rise to this case occurred in this District, as required to confer jurisdiction under section 1391(b)(2). And because the plaintiffs provide no other basis for venue, *see* Docket Items 1 and 40-9, venue in this District is improper.[8]

## II. TRANSFER OR DISMISSAL

As noted above, when a case is filed in a district in which venue is not proper, the court "shall dismiss" the case, "or if it be in the interest of justice, transfer such case to any district . . . in which it could have been brought." 28 U.S.C. § 1406(a). "Whether dismissal or transfer is appropriate lies within the sound discretion of the district court." *Minnette v. Time Warner*, 997 F.2d 1023, 1026 (2d Cir. 1993).

Here, the Court concludes that the interest of justice favors transfer. If true, the plaintiffs' allegations—which the defendants vehemently deny, *see, e.g.*, Docket Item 16—may raise viable RICO claims. It therefore serves the interest of justice to transfer

---

[8] While RICO includes a venue provision, *see* 18 U.S.C. § 1965(a), the plaintiffs do not argue that venue is proper under that statute, *see* Docket Item 40-9 at 10.

15

this case to another district where venue is proper for determination of the merits of those claims.

The parties suggest that venue may be proper in several other districts.  *See* Docket Item 11-3 at 7; Docket Item 39-2 at 17-18; Docket Item 40-9 at 9.  But the Court agrees with several of the defendants that "the contract dispute that is the center of this claim occurred in Manhattan."  Docket Item 39-2 at 14.  Most of the business entity defendants—including Cast Group, the defendant named in all seven agreements—operate out of New York City.  *See* Docket Item 1 at ¶¶ 14-20.  So venue seems to be proper in the Southern District of New York under section 1391(b)(2) because the plaintiffs complain of conduct by those defendants.  *See generally* Docket Item 1.  What is more, the Southern District also seems to be the most convenient forum for this litigation because most witnesses and evidence relevant to the case likely are located within or near that district.

Therefore, to serve the interest of justice, this action is transferred to the Southern District of New York.[9]

---

[9] Even if venue were proper in this District—and it is not—this Court still could and would transfer this case to the Southern District of New York under 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district . . . where it might have been brought."  *See Tlapanco v. Elges*, 207 F. Supp. 3d 324, 328 (S.D.N.Y. 2016) (articulating the factors a court considers when deciding a motion to transfer under section 1404(a)).

**CONCLUSION**

For the reasons stated above, this action is transferred to the United States District Court for the Southern District of New York under 28 U.S.C. § 1406(a). The Court leaves the defendants' pending motions to dismiss to that court.

SO ORDERED.

Dated: February 12, 2024
       Buffalo, New York

                                        */s/ Lawrence J. Vilardo*
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE